UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Global Switching Inc., and Dollar
Phone Corp.,

                    Plaintiffs,              CV-06-412 (CPS)

     - against -                             CORRECTED
                                             MEMORANDUM
                                             OPINION AND ORDER
Hans K. Kasper, SkyMax Dominicana, S.A.
and SkyMax Dominicana Holdings, Ltd.

                    Defendants.

----------------------------------------X

SIFTON, Senior Judge.

     This is an action commenced by two New York corporations,

plaintiffs Global Switching Inc., ("Global") and its subsidiary,

Dollar Phone Corp. ("Dollar Phone"), alleging breach of a joint

venture agreement, against defendant Hans Kasper a citizen of

Georgia and the joint venture, SkyMax Dominicana S.A ("SMD"),[1] a

Dominican corporation. The relief sought in the complaint is an

injunction preserving the status quo pending the completion of

arbitration between the parties.

     The matter is presently before the Court on plaintiffs'

motion for a preliminary injunction barring the defendant Kapser

and companies controlled or acting in concert with him from

competing with the joint venture in the provision of

telecommunications services into or out of the Dominican

--------------------------------------------

     [1] For the purposes of this opinion, SkyMax Dominicana includes SkyMax
Dominicana S.A. and SkyMax Dominicana Holdings, Ltd.

Republic, hiring away employees of the joint venture, using
confidential or proprietary information belonging to the joint
venture to compete with it, or terminating or diminishing service
to customers of the joint venture or otherwise interfering in the
joint venture's customer relations. For the reasons set forth
below plaintiffs' motion for a preliminary injunction is granted.

What follows sets forth the findings of fact and conclusions
of law on which that decision is based, as required by Rule 65 of
the Federal Rules of Civil Procedure.

BACKGROUND

Plaintiffs, Dollar Phone and Global, are owned by Moses
Greenfield and are engaged in the telecommunications business,
providing services for prepaid phone card distributors. Tr. 8:10-
12. Dollar Phone maintains agreements with local phone companies
all over the world to carry calls made with the prepaid phone
cards. Tr. 9:18-22.[2] Global owns the equipment that allows the
calls to go through. Tr. 8:13-15. This includes the various
switches which keep track of the minutes and PINS of the phone
cards used to place calls. Tr. 10:9-19. Both companies are
located in Brooklyn, NY. Tr. 10:6-7, 22-23.

In 2003-2004 Dollar Phone was introduced by its employee,
Peter Austin, to Hans Kasper, owner of the Dominican Republic

---

[2] Dollar Phone also trades minutes as commodities. Tr. 11.

licensed[3] phone company SMD. Tr. 14:16-21. Specifically, SMD had
licenses, from Indotel, to pass calls into and out of the country
and to maintain satellites in the country. Tr. 16:16-25.
Thereafter, Dollar Phone began to purchase minutes from SMD for
calls terminating in the Dominican Republic. Tr. 15:1-4. Dollar
Phone agreed to prepay for minutes in order to obtain a better
rate. Tr. 15:12-17. Because SkyMax Dominicana was short on cash,
Dollar Phone made prepayments in amounts larger than the actual
traffic projected. Tr. 20:23-25. At some point Kasper offered to
convert the debt into a 50% investment in SMD. Tr. 21:18-25.

In February 2005 Global entered into a joint venture
agreement (referred to by plaintiffs and hereafter as the
"Membership Agreement") under which Global purchased a fifty
percent stake in SMD. Pursuant to a simultaneously executed
employment agreement[4] Kasper was hired as CEO and President of
SMD. The employment agreement contained a non-compete provision
which provided as follows:

> Competition Employee will not do, nor intend to do, any
> of the following, either directly or indirectly, during
> Employee's employment with the Company and during the
> period of two (2) years after Employee's cessation of
> employment with the Company, anywhere in the world. In
> the event that Employee improperly competes with the
> Company, the period during which he engages in such
> competition shall not be counted in determining the

---

[3] SkyMax Dominicana is licensed by Indotel, apparently the Dominican
Republic counterpart to the FCC. Tr. 16:6-25.

[4] The Membership Agreement together with the Employment Agreement are
sometimes referred to herein as the "original agreement."

duration of the two (2) year non-compete restriction:

a.   For purposes of this Agreement, "Competitive Activity" shall mean (except with respect or through the entities described in Section 2 hereof) engaging in the business of a "facility based telecommunications carrier," including, without limitation: (i)wholesale termination services, (ii) pre-paid calling card services, (iii) international termination private line services and (iv) internet services.

b.   Employee agrees, except with respect to or through the entities described in Section 2 hereof, that, during the time frames described herein, he shall not, directly or indirectly, own, manage, operate, control, consult for, be an officer or director of, work for, or be employed in any capacity by any company, charitable institutions or any other business, entity, agency or organization (or a discrete business unit within any such entity) whose primary business purpose is to engage in a Competitive Activity.

c.   Employee shall not solicit or perform services in connection with any Competitive Activity for any prior or current customers of the Company or any entities with which the Company has undertaken joint venture activities; or

d.   Employee shall not knowingly solicit for employment (or, following such solicitation, employ) any then current employees employed by the Company.

Section 2 provides that:

Employee shall have the right to manage the affairs and draw compensation from the following entities, each of which are affiliates of Employee: (i) SkyMax Communications, Inc., a Georgia corporation, (ii) SkyMax Communications Group, Inc., a Georgia corporation, (iii) White Communications Dominicana S.A., a Dominican Republic corporation, (iv) SkyNet Dominicana S.A., a Dominican Republic corporation, (v)Solutions Management International, LLC, a Georgia limited liability company, (vi) Solutions Management Dominicana S.A., a Dominican Republic corporation, (vii) Seguridad y Mantenimento Dominicana S.A., a Dominican Republic corporation, (viii) North American Telephone Network Dominicana S.A. and (ix) SkyMax

Dominicana LLC, a Georgia limited liability company.

By letter dated January 17, 2006 plaintiffs notified Kasper that they were terminating his employment because of his violation of the agreement with Global.

On January 27, 2006 plaintiffs filed a arbitration demand alleging fraud, breach of contract, and breach of fiduciary duty against Hans Kasper and requesting a determination of their rights under the parties' agreement. More specifically, plaintiffs alleged that Kasper had misrepresented the value of SMD in order to induce Global to purchase a fifty percent share, had failed to comply with the terms of the parties' agreement and business plan, and had used resources of SMD and the money advanced by Global to SMD for his own and *ultra vires* purposes.

Although the Membership Agreement specifies that disputes are to be resolved by arbitration, it does not provide for injunctive relief pending arbitration, and permits the parties to seek such relief in an appropriate court. Accordingly, pending the arbitration, plaintiffs brought this action seeking preliminary injunctive relief enjoining Kasper from "making any changes to the normal course of business," pending the outcome of the arbitration.

In February 2006[5] I granted a preliminary injunction and

---

[5] The Memorandum Opinion and Order was issued February 16, 2006. The Order granting the preliminary injunction was filed on February 22, 2006.

instructed that Kasper and SMD were:

> (1) enjoined from depositing any funds received on account of SkyMax business into any bank account except a bank account mutually agreed upon by the parties or into an escrow account to be established by the plaintiff under terms prohibiting withdrawals except pursuant to the parties' agreement or order of this Court;

> (2) enjoined from conducting any business by or on behalf of SkyMax except as mutually agreed upon by Moses Greenfield and Hans Kasper, as directors of SkyMax or upon ten (10) days notice to the plaintiff describing the transaction including quantity, amount and identity of the participants.

On March 6, 2006 the defendants moved for modification of the preliminary injunction via a request for reconsideration. However, the parties became engaged in settlement negotiations and requested and obtained a number of adjournments in the hope that the negotiations would render the application moot.

On May 8, 2006 the parties completed their negotiations and exchanged settlement documents. The Settlement Agreement contained several provisions relevant to the present motion. Those provisions are as follows:

> (1) Global agreed to purchase the entirety of Kasper's interests in SMD;

> (2) Global agreed to pay a total of $700,000 for SMD, to be paid in an immediate $100,000 payment and 20 monthly payments of $30,000 each.

> (3) Kasper agreed to a non-competition provision which prevented him from engaging in any competitive activity for a period of 18 months after the date of the agreement "in or relating to the Dominican Republic." The agreement defined competitive activity as, "engaging in the business of (i) wholesale termination

of voice long distance services into the Dominican
Republic, (ii) producing, selling, distributing, or
marketing pre-paid calling cards or pre-paid calling
card services with regard to pre-paid calling cards to
be used in the Dominican Republic, (iii) retail prepaid
cellular (e.g. rechargeable PINs or similar products)
in the Dominican Republic; (iv) using the name "SkyMax"
in the Dominican Republic or (v) use of the name
"SkyMax Dominicana" anywhere in the world.

(4) Kasper also agreed not to "knowingly solicit for
employment (or employ) any then current employees
employed by SkyMax.

(5) The parties agreed to file a joint motion to
dismiss the federal action in the Eastern District of
New York with prejudice.

(5) The parties agreed "for the purposes of making full
and final compromise and settlement" to mutually
release each other from all claims "of any kind or
nature whatsoever, known or unknown." The only claims
to survive the agreement "are claims arising under this
Agreement or the documents entered into this
Agreement."

(6) The parties agreed that, "[a]ny dispute or claim
relating to the breach of this Release or of any of its
related agreements shall be settled only through the
pending AAA arbitration" in Atlanta, Georgia.

Thereafter, Global refused to join in a motion to dismiss the

case. Instead, claiming that Kasper had fraudulently induced

Global to enter into the Settlement Agreement by representing

that he was in compliance with the preliminary injunction when in

fact he was violating the terms of this Court's first preliminary

injunction and that Kasper was violating the terms of the

Settlement Agreement, the plaintiffs made a second motion,

requesting a temporary restraining order, a preliminary

injunction and an Order of Contempt against Hans Kasper.

In their motion for the temporary restraining order plaintiffs alleged that Kasper had threatened to cut off service to one of the joint venture's customers, Americalll. Because I found that plaintiffs would suffer irreparable harm in the form of lost goodwill which could not be compensated by money damages if Kasper cut off service to Americall, on June 1, 2006 I granted a temporary restraining order preventing Kasper from "severing service to Americalll by causing to be severed, by action or inaction, the International Private Line or Satellite links presently servicing Americall's Dominican Call Center." I also issued an Order to Show Cause, returnable on June 13, 2006, why the preliminary injunction requested by the plaintiff should not be granted.

On June 13th, plaintiffs requested that the temporary restraining order from June 1, 2006 be "expanded" to prohibit Kasper from competing with SMD and permitting Global to make payments due to Kasper under the Settlement Agreement. Plaintiff's also requested that the original temporary restraining order be extended for ten days. Because plaintiffs' motions could not be resolved before the expiration of the temporary restraining order I granted the extension. However, because I did not find that it was clear that plaintiffs would suffer immediate and irreparable injury absent the expanded temporary restraining order, I declined plaintiffs' request to

expand the TRO.

Between June 19 and June 23, 2006 I conducted a hearing on the preliminary injunction. Testimony and evidence adduced at the hearing made it more likely than not the case that the allegations made by plaintiffs in their motion for a preliminary injunction were largely true. In sum, plaintiffs have demonstrated a likelihood of success on their request for an injunction pending the arbitration of this matter by establishing that from the inception of his relationship with Greenberg, Dollar Phone and Global, Kasper hid business belonging to SMD, deposited funds belonging to SMD into accounts belonging to Kasper and related entities controlled by him, and induced plaintiffs to enter into a Settlement Agreement by falsely claiming that he had turned over to plaintiffs all relevant financial information about SMD.

<u>Kasper induces Greenfield to buy half of SMD by misrepresenting the scope of his other businesses</u>

Greenfield's decision to buy half of SMD was dependent upon his understanding that Kasper, his future partner, would not compete with their joint venture.[6] Although Greenfield was aware

---

[6] Moses Greenfield devotes much of his time to talmudic learning. Tr. 37. According to his testimony, which I find credible, his general practice in making business decisions is not to spend a great deal of time on investigating the potential business, but rather, to make investments on the basis of the integrity of the person with whom he will do business. Id. In deciding to enter into a business agreement with Kasper, Greenfield relied on his then belief that Kasper was an honorable and trustworthy individual, based on representations by Peter Austin, Greenfield's employee that Kasper was a decent person and Kasper's representations that honesty was of the upmost importance to him, an assertion I find on the evidence at the hearing to be

that Kasper owned or operated several other companies, including
SkyMax Communications Inc. ("SMCI"), Solutions Management and
Seguridad y Mantenimento Dominicana, Greenfield reasonably
believed that Kasper would not use these companies to compete
with the joint venture. Much of the value of SMD was based on its
holding licenses from Indotel (the Dominican version of the FCC)
to operate satellites in the Dominican Republic. Kasper
represented that his American corporations could not acquire such
licenses and, accordingly, could not compete with SMD. Tr. 20,
24. Moreover, Kasper represented that each of his corporations
was engaged in businesses which did not compete with SMD.
Specifically, Kasper told Greenfield that in the Dominican
Republic SMCI was engaged only in the sales of telecommunications
equipment (Tr. 23), that Solutions Management was solely in the
business of customer service (Tr. 46) and that Seguridad Y
Mantenimento was a security company providing armed guards and
other security services to Dominican Corporations. Tr. 46.
Further, a November 19, 2004 e-mail from Kasper to Greenfield
laying out his proposal for a non-compete clause in the
Employment Agreement provides:

> As for the Employment Agreement it should be basically
> what we have discussed in that I will dedicate full
> time to SkyMax Dominicana. I guess that means 5-7 days
> a week 8 plus hours a day and holidays if need be. It
> should also say I agree not to be involved in any

---

dubious at best. Tr. 36.

busienss [sic] that would compete with SMD. However,
the agreement needs to acknowledge that I currently own
other companies, for example, Solutions Management,
SkyMax Communications Inc, Seguridad y Mantenimento and
that I have a right to continue to oversee the affairs
of these organizations on a part time basis. I would
not want to mention the word "growth" as this is
limiting and these organizations may have opportunities
to grow with minimal effort on my part. I guess the key
words here are part time and Full time. But, I am
flexible as well let me know if you have any other
suggestions?

Ex. 2.[7]

Defendant contends that stated that his companies were

engaged in the provision of telecommunications services to the

Dominican Republic and that Greenfield was aware of this fact. In

support, defendant points to a June 2004 invoice from SkyMax

Communications Inc ("SMCI"), one of Kasper's corporations, to

Dollar Phone for minutes terminating in the Dominican Republic as

evidence that Greenfield must have been aware of SMCI's business

in the Dominican Republic. Ex. 1. However, Greenfield testified

credibly that he didn't look at the invoice's letterhead

carefully and, accordingly, failed to notice that it was from

SMCI and not SMD. Tr. 31. Except for the names, which are

themselves similar, the form of invoice used by the two companies

---

[7] Defendant objects to plaintiffs' reliance on this e-mail on parol
evidence grounds. However, the non-compete agreement is, to say the least,
ambiguous. On defendant's reading of the non-compete clause it would say no
more than that Kasper could compete provided he used one of his existing
corporations, a provision so open ended as to render the clause meaningless,
although even as so construed Kasper in all likelihood violated it. More
likely, the reference to Kasper's corporations was intended to limit the
otherwise unnecessarily broad scope of the non-compete clause. See infra, pg.
3.

is virtually identical. Moreover, as discussed below, employees

of SMCI and SMD under the supervision of Kasper regularly acted

as though the two companies worked as one entity and paperwork

was not infrequently sent out on the wrong letterhead. In short,

I find that Greenfield testified credibly that he believed that

SMCI's telecommunications business was limited to the United

States.[8] Tr. 148.

*The Formation of Xtreme*

    Chris Zambito,[9] a SMCI employee of Kasper's testified

---

[8] Defendant has, to date, with good reason, not argued that Greenfield was aware of SMCI's Dominican telecommunications business because an executive summary provided to Greenfield by Kasper prior to the agreement purported to summarize the business of SMCI and disclosed that it was in the business of telecommunications in the Dominican Republic. Ex. 2(a). Greenfield testified credibly that this business plan actually summarized the business of both SMD and SMCI since at the point in the negotiations at which the summary was produced Greenfield was considering purchasing a share in both entities. Tr. 185. This is supported by the fact that the summary of SMD included in the actual agreement, includes substantially the same business description as the Executive Summary except that it excluded reference to the sale of communications equipment (as that was the SMCI business). Ex. 5.

[9] The defendant testified that Zambito's testimony should be disregarded entirely as unreliable because Zambito, by attempting to blackmail Kasper, demonstrated that he (Zambito) is not a trustworthy individual. Accordingly, the alleged "blackmailing" incident, though not essential to this opinion, is discussed below.
    As discussed in more depth in the body of this opinion, SMD had and has a contract to provide telecommunications services to Americall at a call center in Puerta Plata. Although Kasper hid the existence of the Americall account from Greenfield, Greenfield was aware that SMD owned a satellite in Puerta Plata.
    After the Settlement Agreement was signed Kasper decided to tell Greenfield that the Puerta Plata call center had been decommissioned, even though Kasper intended to continue using the satellite. In order to make this story plausible Kasper needed to purchase a new satellite which he could return to Greenfield and pass off as the decommissioned satellite.
    Kasper approached Zambito and demanded that Zambito give him $30,000 from the Xtreme Communications account (a company started by Zambito at Kasper's behest), in part so that Kasper would have the money to purchase the satellite. At first, Zambito refused. Then, on May 7, 2006 Zambito sent Kasper an e-mail proposing three different methods of dispersing the $30,000 and stating that if none of the methods were acceptable to Kasper then Zambito

credibly that in November 2005 Kasper instructed him to form a
company called Xtreme Communications ("Xtreme") in order to
compete with SMD. Tr. 254. Although Zambito and Betty Kasper
(Hans Kasper's wife) would be the principals of the new
corporation, Kasper was to receive 50% of the profits as a
consulting fee. Tr. 255. Kasper's control of Xtreme is further
evidenced by the fact that the Employer Identification Number for
Xtreme issued by the IRS listed Hans Kasper as the contact
person, as well as his social security number. Ex. 22. Kasper
also opened Xtreme's first bank account at Bank of America, and
was initially the sole signatory on the account. Ex. 25, 26.
After the issuance of the preliminary injunction Kasper told
Zambito that he had to disassociate himself from Xtreme and
accordingly, that Zambito should open an account for Xtreme in
his own name. Tr. 295, 366, 460. Thereafter Zambito opened a new
bank account at Fidelity without, it should be noted, any
assistance from Kasper.

     Kasper testified that he did not instruct Zambito to form

---

would have no other option than to go to Greenfield and turn over all of the
information Zambito had about Kasper. Ex. J. It is this statement that Kasper
alleges was Zambito's blackmail attempt. However, Zambito testified credibly
that he was not blackmailing Kasper and intended to go to Greenfield
regardless of Kasper's response. Kasper convincingly explained that the e-mail
was an elaborate ruse to convince Kasper, a savvy, if not devious business man
himself, that Zambito was intending to turn over some of the money. Zambito
wanted to buy a few more days so that Kasper would sign the Settlement
Agreement and free SMD from its ties to Kasper. Tr. 372. In any event, even
after Kasper agreed to Zambito's proposal, Zambito continued to stall in order
to permit the settlement to go through.

Xtreme, that he was never entitled to 50% of the profits as a
consultant fee and that he did not give Zambito permission to
obtain a tax ID in Kasper's name. Tr. 425, 532, 523. I find his
testimony implausible. Kasper admits that he was at least
involved to some degree in starting Xtreme because he concedes
that Zambito was supposed to give him $10,000 for getting Xtreme
up and running. Tr. 531. Kasper's explanation that he opened a
bank account for Xtreme because Zambito had bad credit is not
credible. It is contradicted by evidence that Zambito had no
trouble obtaining a bank account at Fidelity shortly thereafter.

*Xtreme Competes with SMD by Soliciting CVTEl*

Prior to February 2006 CVTel was a SMD customer. However, at
Kasper's direction Zambito solicited CVTel to become an Xtreme
customer. Tr. 359.  Kasper also personally solicited the CVTel
account for Xtreme. Tr. 360. Anthony Christie of CVTel credibly
testified that Christie learned of Xtreme from "Hans," Tr. 554,
and that he went to "Hans" whenever he had any problems or
questions concerning Xtreme. Tr. 556-557.  The solicitation was
successful and on February 23, 2006 CVTel signed a contract with
Xtreme. Ex. 33. Xtreme then provided service to CVTel through
SMD's network. Kasper told Zambito that SMD would bill Xtreme for
the traffic and that Xtreme would then bill CVTel. Tr. 266.
However, SMD did not bill Xtreme and Xtreme never paid SMD for
the traffic passed over SMD's network. Tr. 267. In fact, in order

to keep the Xtreme/CVTel contract secret it credibly appears
Kasper directed Zambito, and SMD employee Ruth Sanchez to delete
the call detail records for CVTel from SMD's database. Despite
this, Peter Austin, who was unaware of the Xtreme contract became
suspicious that CVTel was not being billed properly by SMD and
shut down service to CVTel in mid-March. Thereafter Xtreme passed
CVTel traffic over a DGTec network. In May Zambito asked former
SMD employee Ruth Sanchez to obtain the billing data for Xtreme
from SMD and to prepare invoices from SMD to XTreme. Ex. 35, 36.
Although Kasper testified that he did not solicit CVTel for
Xtreme and did not direct the deletion of the call detail
records, I again find this testimony less than credible. Tr. 461.
Kasper suggests that even if he had been involved in Xtreme, that
the provision of services through Xtreme would not constitute
competition with SMD because SMD was interconnected only with
Verizon where as Xtreme offered connection through all of the
carriers in the Dominican Republic. Tr. 368. However, since SMD
could have contracted for these services, just as XTreme did, in
order to expand its coverage, Xtreme was not actually providing
services that SMD could not provide. Tr. 397.

Solicitation of IBasis By XTreme

   Zambito testified credibly that Kasper solicited SMD
customer IBasis to switch to being an Xtreme customer with the
intention that SMD would sell to Xtreme and XTreme would sell to

IBasis. Tr. 261. This is corroborated by e-mails between Kasper
and IBasis concerning the possibility of doing business. Ex. 30,
31. Zambito testified that the negotiations were successful and
that at Kasper's direction Zambito signed a contract and sent it
to IBasis. However, Xtreme never received a signed contract in
return and has not passed any IBasis calls over its network. Tr.
365.

Kasper conceded that he "flirted" with the idea of
recruiting IBasis as an Xtreme customer. Tr. 454. However, he
stated that he ultimately decided not to recruit IBasis because
"as time went on I got less mad [about his supposedly unjustified
termination]" and because he "didn't want to get involved." I
find this testimony less than credible. Observation of Kasper at
the hearing demonstrates that he continues to be "mad" at
plaintiffs although the origin of this animus seems unrelated to
any injustice on Moses Greenfield's part.

*Kasper solicits new customers to XTreme:*

In April 2006 Kasper solicited business from two new
customers, Five Star Communications and WWDJ. This is evidenced
by e-mails between Kasper and those companies concerning the
customer's needs. Ex. 28, 29. Zambito testified credibly that
Kasper passed those leads on to Zambito so that Zambito could
complete the process of acquiring them as Xtreme customers. Tr.
324. The e-mails themselves indicate that Kasper forwarded his

communications with the potential customers to Zambito. In fact,
Kasper's message to Zambito when forwarding the Five Star
Communications e-mail was, "here is a lead for Xtreme
Communications." Ex. 28.

*Kasper Competes Through SMCI*

Although Kasper represented to plaintiffs that SMCI was not
a competitor of SMD, in December 2005 SMCI signed a contract with
Vinniculum to provide telecommunications services in the
Dominican Republic. Ex. 32. However, Vinniculum never passed any
significant call traffic in connection with its SMCI contract.
Tr. 547.

Kasper also attempted to compete with SMD by "transferring"
SMD customer GoToTel to SMCI in February 2006. Zambito testified
credibly that Kasper accomplished this by having Zambito instruct
Ruth Sanchez to stop billing GoToTel from Xtreme and instead to
begin billing GoToTel from SMCI. Tr. 323, 324. When plaintiffs
became aware that two GoToTel payments had been deposited into
the SMCI account and demanded repayment, Kasper turned over the
money. Tr. 449. Kasper claims that GoToTel was always an SMCI
customer and that he agreed to give up the funds demanded by
plaintiffs only because he didn't want to fight about it. Tr.
451. I also find this testimony less than credible. In any event,
SMCI either had GoToTel as a customer from the outset, or

attempted to recruit GoToTel as a customer in February 2006. Either constitutes competition with SMD.

Kasper hides Americall Account from Greenfield

Marcom, and its successor, Americall, contracted with SMD to connect a call center in Puerta Plata, Dominican Republic first to a Marcom call center in Sunrise Florida, and later, after Americall bought Marcom, to an Americall call center in St. Louis Missouri. Marcom also contracted with SMCI to provide customer support. When Kasper sold 50% of SMD to Greenfield, Kasper hid the existence of Marcom/Americall and began to treat Marcom/Americall as a SMCI customer in order to avoid sharing profits with Greenfield.

This is evidenced, first, by the fact that the initial written contracts are between Marcom and SMD and were signed as such by Kapser. Ex. 9. Zambito testified that as a contract concerning services in the Dominican Republic, the Americall contract belonged to SMD and not SMCI. Tr. 193. The SMD business plan included in the parties initial agreement included reference to SMD's "long and short term contracts for voice and data services." Ex. 5. Kasper conceded that the services to Americall would fall into this category, and admitted that if Americall was not an SMD customer than he could think of no other SMD customer to whom such services were provided. Tr. 491. Zambito further testified that after the issuance of the first preliminary

injunction Kasper approached Americall about re-assigning the
Americall contracts from SMD to SMCI. Tr. 238. This evidences
Kasper's knowledge that the contracts belonged to SMD.

Defendant offers several arguments in favor of considering
Americall a SMCI customer. First, Kasper testified that prior to
the initial agreement he showed Greenfield the Puerta Plata call
center utilized by Americall and claims that he made clear that
while the satellite at that location belonged to SMD the contract
with Americall belonged to SMCI. Tr. 427. However, this testimony
is inconsistent with Greenfield's common sense testimony that he
would not have gone into business with a partner who he knew was
going to compete with him.

Kasper testified that although the contracts were originally
made between Marcom and SMD, they were immediately reassigned to
SMCI to reward him for his assistance in setting up the call
center. Again, Kasper's testimony is dubious. He offers no
explanation why, if SMD could not support the call center, he
signed the agreement between SMD and Marcom. Nor does he offer
any other credible reason for wanting to switch the contract from
one entity in his control to another entity also in his control.

Kasper testified that regardless of whether the contract was
transferred to SMCI immediately after its inception, that when
Americall decided to move the satellite landing point out of
Florida it terminated the existing contract and entered into a

new oral contract with SMCI. This testimony is unconvincing.
First, Kasper has offered no reason why Americall would terminate
a contract and begin a new oral contract for the sole purpose of
effectuating a change in landing point. It seems more likely that
Americall would have modified only the landing point and left the
rest of the contract intact. Moreover, Kasper has offered no
explanation why, if Americall did terminate the contract, it
would have chosen to begin the new contract with SMCI rather than
SMD. In fact, given that Kasper was the public face of both
corporations, if Americall did enter into a new oral contract, it
is unlikely that Americall even considered the issue of which
entity would provide the services. Americall probably assumed
that it was continuing to contract with the same entity since it
continued to deal with the same individual, namely, Kasper.

Kasper also argued that the Americall contract must have
belonged to SMCI because the expense of providing services to
Americall was born by SMCI.  Tr. 336; Ex. O-S. However, it makes
sense that having deprived SMD of revenues from Americall, SMCI
would then have to bear the expense of providing service to
Americall. Had Kasper attempted to have SMD bear the expense of
the services and tried to keep the payments to himself, the
deceit might have been exposed earlier. In the same vein, it
makes sense that invoices to Marcom and to Americall were
generally on SMCI letterhead.

Kasper notes that a 2005 agreement for services to Americall in St. Louis is between Americall and SMCI. Ex. 10. However, as above, it makes sense that having successfully deprived SMD of revenues from Americall, Kasper would simply execute a subsequent contract on behalf of SMCI. Since Kasper was both a representative of SMCI and of SMD, and since the names Sky Max Dominicana and SkyMax Communications are not very different, Americall may not even have noticed the switch. Similarly, the fact that in 2006 Americall sent a letter to SMCI to confirm its services does not demonstrate that the contract actually belonged to SMCI since by that point Kasper had represented to Americall that their contract was with SMCI. In sending the letter Americall likely copied the SMCI contact information from the most recent 2005 contract.

Kasper ineffectively attempts to explain away the effect of the inclusion of "long and short term contracts for voice and data services" by claiming that the inclusion of that language was a mistake. Tr. 491. He also claims, that he never attempted to have the Americall contract reassigned. Tr. 441. Rather, Kasper claims that he merely consulted with his attorney to discuss the possibility of reassignment because he wished to clarify that the contract belonged to SMCI. Tr. 475.

Kasper also argues that a January 2006 e-mail exchange in which he tells Rachel Klein at Dollar Phone that service to the

Americall call center should be billed to SMCI demonstrates that Americall was always a SMCI customer and that Kasper never tried to hide this. Ex. H. However, he wrote that e-mail after Klein received a bill for services to the Americall call center and contacted Kasper to inquire about it. At that point, he may well have felt that he had already been caught with his hand in the cookie jar and thus was obligated to attempt to gloss over the situation by simply directing Klein to send the bill to him to be paid. However, this attempt was unsuccessful and the e-mail served as a "red flag" for Greenfield, and was part of the reason Greenfield fired him. Tr. 155.

Finally, Kasper points to a single bill from SMD to SMCI for use of the SMD satellite at the Puerta Plata call center as suggesting that SMD should have known that SMCI was providing service to Americall Ex. C. However, since Kasper was running both SMD and SMCI it is entirely plausible that no one at SMD noticed the single invoice or understood its relevance. Nor, as discussed above, is the fact that SMCI actually bore the cost of satellite dispositive.

<u>Recruitment of Sanchez</u>

On March 9, 2006 Ruth Sanchez resigned from SMD at Kasper's urging. At Kasper's direction when she resigned she took a hard-drive with SMD billing information on it with her. Tr. 528. Only a few days later she began working for both SMCI and XTreme from

her home. Kasper's control of Sanchez is evidenced by the fact that Kasper had the power to direct Sanchez to cease or to continue working for Xtreme. Ex. 42.

Kasper claims that he did not urge her to resign from SMD and that she did so for personal reasons. However, this explanation is not credible since if Sanchez resigned from SMD for personal reasons, those personal reasons would likely have prevented her from immediately beginning to work for other telecommunications companies. Kasper also claims that he gave Sanchez permission to take only computer equipment that belonged to Solutions Management. Tr. 528. However, it is clear that Sanchez also took computer equipment containing SMD information since after resigning she was able to access SMD billing information in order to create an invoice from SMD to Xtreme. Tr. 534. Kasper also claims that he did not have the power to tell Sanchez who to work for. He testified, unconvincingly, that when he left a voice-mail for Chris Zambito saying that he told Sanchez to take care of Zambito's billing he was just urging Sanchez to help Zambito, not directing her to do so.

Kasper Induced Plaintiffs to Enter into the Settlement Agreement

On the evidence presented at the hearing, Kasper induced the plaintiffs to enter into the Settlement Agreement by falsely representing that he had disclosed all relevant financial information. Greenfield testified credibly that Kasper told him

that Greenfield was in possession of all relevant SMD financial
information. Tr. 80:21. By e-mail dated March 13, 2006 Kasper's
counsel sent plaintiff a list of customer invoices and of account
transactions and represented that the attached information
combined with the accounting information already in the hands of
the plaintiff "should allow your client to get up to speed on the
company." Neither GoToTel nor Americall were included on the
list. Defense counsel clarified his representation in a follow-up
e-mail on March 14, 2006, stating:

> All SkyMax Dominicana, S.A. account information (all
> payments in and payments out) from the Skymax
> Dominicana, LLC bank account were provided to you in
> the attachment I sent. *No Skymax Dominicana S.A.
> account information is being witheld.* Additionally, I
> have been assured by my client that if any additional
> payments are mistakenly made to the LLC account, you
> will be notified. I hope that clears up any concerns
> about the account information.

Ex. 11. (emphasis added).

Thereafter, during the drafting of the Settlement Agreement,
plaintiffs requested that defendant make certain representations.
Defendant's response, in declining to do so, again represented to
plaintiffs that they were in possession of all of the relevant
SMD accounting information. The proposed representations and
Kasper's responses are as follows:

representation one:

> The balance sheets of Holdings, SkyMax Georgia, and
> SkyMax attached hereto as Exhibits C, D, and E
> respectively, reflect the true and accurate assets and
> liabilities of each entity as of the dates shown

thereon.

response:

We cannot provide any balance sheets relative to
holdings or SkyMax as your client handled all
accounting regarding these entities.

representation two:

The income and expenditure statements of Holdings,
SkyMax Georgia, and SkyMax from 1/1/06 to date,
attached hereto as Exhibits F, G and H respectively,
accurately reflect all transactions of each entity of
the dates stated shown theron, and that each is a bona
fide income or expenditure for each stated entity.

response:

We cannot provide any income statements relative to
Holdings or SkyMax as your client handled all
accounting regarding these entities.

Ex. 13.

## Kasper's current plans for the satellite

Kasper's current plan for the Americall center is to provide
satellite services, not through SMD, but through a different
provider, Cablenet. Tr. 252. He also wants to switch long
distance providers from Quest to another provider whose name is
omitted from this opinion at the parties' request, arguably
because he has not paid his Quest bill and Quest is threatening
to cut off service. Tr. 507. Avroham Horowitz, the Chief
Operating Officer of Dollar Phone and employed in the
telecommunications field for five and a half years testified
credibly that while Quest is a tier one provider, the other
provider is in tier two and provides inferior quality service.

Kasper claims that the other provider would provide better service and at a lower cost. However, I did not find his testimony credible.

## DISCUSSION[10]

Preliminary Injunction

Plaintiffs request a declaration that the original preliminary injunction remains in effect and a modification in the form of an expansion of the original preliminary injunction. "The decision whether to modify a preliminary injunction involves an exercise of the same discretion that a court employs in an initial decision to grant or deny a preliminary injunction." *Weight Watchers Int'l, Inc., v. Luigino's Inc.*, 423 F. 3d 137, 141 (2d Cir. 2005). In order to prevail on a motion for a preliminary injunction, plaintiffs must satisfy two requirements. First, they must show that absent a preliminary injunction they are likely to suffer an irreparable injury. Second they must show either that (a) they are likely to succeed on the merits of their case, or (b) they have raised questions going to the merits that are sufficiently serious to render them fair grounds for

---

[10] The parties' briefs cite cases applying New York law, and "such 'implied consent . . . is sufficient to establish choice of law.' ' *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) (quoting *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)). In any event, where, as here, the parties are silent about the choice of law question, the Court may apply the law of the forum. See *Michele Pommier Models v. Men Women N.Y. Model Mgmt.*, 14 F.Supp.2d 331, 336 (S.D.N.Y. 1998) (citing *Keles v. Yale University*, 889 F.Supp. 729, 733 (S.D.N.Y. 1995)).

litigation, and that a balancing of the hardships tips decidedly towards the movant. *Bery v. City of New York,* 97 F.3d 689, 694 (2d Cir. 1996).

Irreparable Harm

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction . . . Accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id.* To satisfy the irreparable injury requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer "an injury that is neither remote nor speculative, but actual and imminent," and one that cannot be remedied "if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer,* 408 F.3d 112, 114 (2d Cir. 2005) (citing *Rodriguez by Rodriguez v. DeBuono,*, 175 F.3d 227, 234-35 (2d Cir. 1998). Furthermore, irreparable harm is injury for which monetary damages cannot be adequate compensation. *Polymer Tech Corp. v. Mimram*, 37 F.3d 74, 82 (2d Cir. 1994).

Plaintiffs allege that they will be irreparably harmed if defendant competes with SMD through Xtreme or though any other means, employs or recruits former SMD employees, decreases the quality of service to Americall or other customers of SMD, or

uses confidential and proprietary information of SMD.

Competition Through Xtreme or Otherwise and the Use of
Confidential Customer Pricing Information:

"In cases such as this, involving a person competing with
his or her former employer, particularly when such activity is
prohibited by a restrictive covenant or is facilitated by the
misappropriation of trade secrets or customer information, courts
have often taken a somewhat relaxed approach to the irreparable
harm inquiry, and in certain circumstances have found it
appropriate to presume the existence of such an injury."
*Innoviant Pharmacy, Inc. v. Morganstern,* 390 F.Supp.2d 179, 188-
189 (N.D.N.Y. 2005), (citing, *Wenner Media LLC v. Northern &
Shell North Am. Ltd.,* No. 05 Civ. 1286, 2005 WL 323727, at *3-4
(S.D.N.Y. Feb. 8, 2005)). "Generally, when a party violates a
non-compete clause, the resulting loss of client relationships
and customer good will built up over the years constitutes
irreparable harm." *Johnson Controls, Inc. v. APT Critical Systems
Inc.,* 323 F.Supp.2d 525, 532 (S.D.N.Y. 2004). "Irreparable harm
to an employer may also result where an employee has
misappropriated trade secrets or confidential customer
information, including pricing methods, customer lists and
customer preferences." *Id.* at 532-33; *see also FMC Corp. v.
Taiwan Tainan Giant Indus. Co., Ltd.,* 730 F.2d 61, 63 (2d
Cir.1984); *Hillard v. Medtronic, Inc.,* 910 F.Supp. 173, 179
(M.D.Pa. 1995) ("To the extent that the restrictive covenant is

being violated, [former employer] is suffering irreparable harm by the potential loss of customers posed by [former employee's] activities."). "Indeed, irreparable harm is presumed where a trade secret has been misappropriated, even in the absence of an employment agreement." *Johnson Controls, Inc.,* 323 F.Supp.2d at 533 (citations omitted).

Plaintiffs here have established that defendant Kasper was competing with SMD through both SMCI and Xtreme. In doing so, Kasper solicited then clients of SMD and potential SMD customers. In executing these solicitations Kasper undoubtedly utilized his vast knowledge of SMD, as former CEO and President of SMD. He was also in possession, through Ruth Sanchez, of confidential customer billing information of SMD. SMD's loss of actual and potential clients through Kasper's competition and use of confidential SMD customer lists and pricing information constitutes irreparable harm.

Employing Former SMD Employees

Just as the violation of a non-compete in the solicitation of customers constitutes irreparable harm, the violation of a non-compete by the solicitation of employees also constitutes irreparable harm. *Natsource LLC v. Paribello*, 151 F.Supp.2d 465, 469 (S.D.N.Y. 2001). In the present case Kasper induced SMD employee Ruth Sanchez to leave SMD and work for SMD competitors SMCI and Xtreme. Sanchez brought with her confidential customer

information contained on a computer hard drive she removed from SMD as well as her personal inside knowledge of SMD customers and billing information. The loss of Sanchez's services to SMD and the provision of those services to SMD competitors will cause immediate and immeasurable harm to plaintiffs and also constitutes irreparable harm.

Decrease in Quality of Service to SMD

The loss of customer goodwill constitutes an irreparable injury. *Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F.Supp.2d 525, 532 (S.D.N.Y. 2004). As the Second Circuit explained, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69-70 (2d Cir. 1999); see also *Velo-Bind, Inc. v. Scheck*, 485 F.Supp. 102, 109 (S.D.N.Y. 1979) ("What is at stake here is plaintiff's good will built up over the years, which is not, contrary to defendant's assertion, monetarily ascertainable.").

Plaintiffs here have demonstrated that Kasper intends to decrease the quality of the service provided to SMD customer Americall by switching to a lower quality long distance provider. The provision of lower quality services to Americall will damage SMD's good will with Americall. Because the loss of that good will is both immediate and immeasurable the plaintiffs have

demonstrated that they will be irreparably harmed by Kasper's actions.

Likelihood of Success on the Merits

Plaintiffs must also show that they are likely to succeed on the merits of their claim, here, a breach of contract claim. Kasper argues however, that plaintiffs cannot show a likelihood of success on the merits because any claims against Kasper for breach of the parties original agreement were released in the Settlement Agreement. Plaintiffs respond that they are entitled to reformation of the contract based on defendant's fraud in inducing them to enter into the Settlement Agreement.

"New York permits reformation of a contract where a writing does not set forth the actual agreement of the parties due to mutual mistake or fraudulently induced unilateral mistake." *Pless v. Cleveland Wrecking Co.* 2005 WL 2811814, *3 (W.D.N.Y. 2005)(quoting, *George Backer Mgmt. Corp. v. Acme Quilting Co., Inc.,* 46 N.Y.2d 211, 218-19, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978)). More specifically, "[i]n a case of fraud, the parties have reached agreement and, unknown to one party but known to the other (who has misled the first), the subsequent writing does not properly express that agreement." *Chimart Associates v. Paul,* 66 N.Y.2d 570, 573(1986). However, to compensate for the danger that a party, "having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a

different oral contract," there is a heavy procedural burden on
the party seeking reformation." *Collins v. Harrison-Bode,* 303
F.3d 429, 435 (2d Cir. 2002)(quoting *Chimart Associates v. Paul,*
66 N.Y.2d 570, 573-574 (1986)). Accordingly, "[t]he proponent of
reformation must show in no uncertain terms, not only that
mistake or fraud exists, but exactly what was really agreed upon
between the parties." *Collins v. Harrison-Bode,* 303 F.3d 429, 435
(2d Cir. 2002)(citations omitted).

Here plaintiffs will in all likelihood be able to show that
Kasper fraudulently induced them to enter into the Settlement
Agreement. However, plaintiffs cannot show, absent the fraud,
what was really agreed upon between the parties.[11] It is unlikely
that Kasper meant for plaintiffs to retain their claims against
him, and also meant to sell his interest in SMD at the agreed
upon price. Accordingly, because plaintiffs cannot demonstrate
what was actually agreed upon between the parties they are not

---

[11]  Plaintiffs' reliance on *Koam Produce, Inc. v. Dimare Homestead,
Inc.,* 213 F.Supp.2d 314, 326 (S.D.N.Y. 2006) for the proposition that a court
may strike one portion of an agreement without rescinding the entire contract
is inapposite. In that case, Koam had contracted to purchase tomatoes from
Dimare. Upon arrival at Koam the tomatoes were inspected by an agent of the
United States Department of Agriculture ("USDA") and upon a report by the
agent that the tomatoes were of an inferior quality the parties agreed to
modify the price agreed upon in the original contract. When it became apparent
that the tomato buyers had bribed the USDA agents to report that acceptable
tomatoes were of an inferior quality the court reformed the parties agreement
to modify the price and forced the buyers to pay the price agreed upon in the
original contract. In *Koam* the court was able to reform the agreement because
the existence of the original contract allowed the court to determine what had
actually been agreed upon between the parties absent the fraud. However, in
the present case, it is impossible to determine what the parties actually
agreed upon absent the fraud and it is therefore impossible to reform the
contract.

entitled to reformation of the Settlement Agreement. Instead, plaintiffs must choose either to enforce the contract or to void it. *Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005)(A contract entered into through fraud in the inducement may be voided or enforced). More specifically, plaintiffs may either enforce the Settlement Agreement and accordingly will have released Kasper from any liability for his behavior preceding the Settlement Agreement (but not after), or plaintiffs may opt to rescind the agreement, and pursue Kasper for his pre-settlement violations, but relinquish the agreed upon terms for purchase of SMD.

In order to be entitled to void the Settlement Agreement plaintiffs must demonstrate that Kasper fraudulently induced them to enter into the agreement. This requires plaintiffs to show (1) misrepresentation a material fact; (2) knowledge of the representations falsity or reckless disregard of its falsity coupled with an intention to cause harm by deception (3) reasonable and justifiable reliance on the false representation and (4) resulting injury. *Kregos v. Associated Press,* 3 F. 3d 656, 665 (2d Cir. 1993).

Plaintiffs have demonstrated that Kasper, through his attorneys, represented that plaintiffs were in possession of all relevant financial and account information. As discussed above, these statements were in all likelihood untrue and Kasper was aware that they were untrue since Kasper was in possession of

account information for SMD customers Americall and GoToTel which
Kasper hid from plaintiffs. Thus, defense counsel's statements
were a misrepresentation.

Defendant argues however that even if misrepresentations
were made, plaintiff was not reasonable in relying on them
because the representations were made by a legal adversary and
because defense counsel explicitly declined to make certain
written representations in the Settlement Agreement. However, the
cases cited by defendant do not support the proposition that
reliance on factual allegations by an adversary or his attorney
is unreasonable, but hold only that the reliance on an
adversary's legal opinion is unreasonable.[12] *Egos v. Associated
Press,* 3 F.3d 656 (2d Cir. 1993)(the court held only that the
plaintiff had, "no reasonable right as a matter of law to rely
upon *legal opinions* offered by" the adversary)(emphasis added);
*Verschell v. Pike,* 85 A.D.2d 690 (2d Dep't 1981)(the court held
only that "plaintiff's attorney was not justified in relying upon

---

[12] Defendant also points to *Lazich v. Vitteria*, 189 A.D.2d 753 (2d Dep't
1993) in support of his argument that plaintiff could not reasonably rely on
any representations made by him. However, in that case the court held that a
plaintiff could not reasonably rely on controverted statements made during the
pendency of an action for divorce. However, in this case, the statements made
were not controverted and were made during settlement negotiations, by their
nature a cooperative endeavor, and not during the pendency of an adversarial
legal proceeding. Defendant also points to *P Chimento Co. Inc. v. Banco
Popular de Puerto Rico*, 208 A.D.2d 385 (1st Dept 1994) in which the court held
that a "sophisticated business man" could not simply rely on his adversaries
misrepresentations where "with the exercise of ordinary care or intelligence,
it could have ascertained the true nature of the transaction involved but
failed to do so." However, in the present case the evidence demonstrates that
Kasper took great pains to hide his actions. Accordingly, plaintiffs could not
have discovered his misrepresentations through ordinary care or intelligence.

his adversary's statement that the lease was *legal* under the zoning ordinance." (emphasis added); *LoGalbo v. Plishkin, Rubano & Baum*, 197 A.D.2d 675 (2d Dep't 1993)("an attorney simply cannot justifiably rely on the representation of his or her adversary which is inconsistent with existing law and the clear provisions of a contract.") There is a clear distinction between an attorney's reliance on the legal opinion of an adversary and the reliance on a factual representation. A lawyer is, presumably, just as capable as his adversary of determining the applicable law. Accordingly, it is unreasonable for him to rely on the adversary's legal representations. However, a party is not (as is the case here) as capable as his adversary of determining the veracity of factual representations made by his adversary. Accordingly, it is reasonable where, as here, the adversary is in sole possession of certain factual information, and it would be difficult or impossible to verify the information, for a plaintiff to rely on factual representations by an adversary.

Defendant argues however, that Kasper's refusal to make the requested written representations should have suggested to plaintiffs that he could not make them because they were untrue. However, Kasper explained his refusal as being necessary because plaintiffs were in possession of all the relevant documentation. Plaintiffs had little reason to doubt this statement, and accordingly accepted Kasper's proffered explanation. They had

little reason to suspect that, as Kasper's argument implicitly concedes, he could not make the representation because he was in possession of documents and information connected to the SMD accounts which he had hidden from plaintiffs.

The final prong of a fraudulent misrepresentation requires plaintiff to show that it was harmed by the misrepresentation. In the present case plaintiffs were clearly harmed because they were induced to release Kasper from any claims against him without having any understanding of the extent of those claims. Accordingly, plaintiffs have demonstrated a likelihood of success in establishing that Kasper's fraudulent misrepresentation induced them to enter into the Settlement Agreement.

If, on the basis of the fraudulent inducement, plaintiffs elect to void the Settlement Agreement, then the parties are returned to the status quo, and the original agreement between them is binding.

In order to demonstrate a likelihood of success on the merits on their non-compete claims plaintiffs would have to show that the restrictive covenant contained in defendant's contract is enforceable. Under New York law, the enforceability of a restrictive covenant depends in part upon the nature of the underlying contract. While courts generally enforce restrictive covenants in the context of a contract for the sale of a business, courts are more hesitant to enforce restrictive

covenants in the employment context. *Purchasing Assocs. v. Weitz,* 13 N.Y.2d 267, 246 N.Y.S.2d 600, 196 N.E.2d 245 (1963). Enforceability in the first instance rests on the premise that "a buyer of a business should be permitted to restrict his seller's freedom of trade so as to prevent the latter from recapturing and utilizing, by competition, the good will of the very business which he transferred for value." *Id.* Accordingly, reasonable restrictive covenants ancillary to the sale of a business "are routinely enforced" to protect the goodwill paid for by the purchaser. *Id.* at 1214 (citing *Chevron U.S.A., Inc. v. Roxen Serv. Inc.,* 813 F.2d 26, 28 (2d Cir. 1987)).

In contrast, courts view employment restrictive covenants with suspicion "because enforcement of employee restrictive covenants may result in the loss of an individual's livelihood." *Id.* (citing *American Inst. of Chem. Eng'rs v. Reber-Friel Co.,* 682 F.2d 382, 387 (2d Cir.1982)). As the Court of Appeals noted in *American Broadcasting Cos. v. Wolf,* 52 N.Y.2d 394, 404, 438 N.Y.S.2d 482, 420 N.E.2d 363 (1981), "once the term of an employment agreement has expired, the general public policy favoring robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition." Accordingly, New York courts and federal courts interpreting New York law have held that a restrictive covenant in the employment context will only be enforced if it is

reasonable in both time and geographic area. *See Ticor Title Ins. Co. v. Cohen,* 1998 WL 355420 (S.D.N.Y. 1998) (citing *Reed, Roberts Assoc., Inc. v. Strauman,* 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976)), *aff'd,*173 F.3d 63 (2nd Cir. 1999); *see also Maltby v. Savage, Inc.,* 166 Misc.2d 481, 485, 633 N.Y.S.2d 926 (N.Y.Sup. 1995) ("Although the courts of New York have adopted a strict approach in construing noncompetition agreements and restrictive covenants, the courts have repeatedly enjoined employees from breaching such agreements when they are reasonable in scope, duration, and . . .area."). If a covenant is overly broad a court may narrow it in order to render it enforceable. *AM Medica Communications Group v. Kilgallen* 90 Fed. Appx. 10, 11, (2d Cir. 2003) *(citing BDO Seidman,* 93 N.Y.2d at 394, 690 N.Y.S.2d at 860-61, 712 N.E.2d 1220.) Once a covenant is deemed reasonable, it must still fall into one of two categories in order to be enforced. *See Reed,* 40 N.Y.2d at 307, 386 N.Y.S.2d 677, 353 N.E.2d 590. For an employer to prevail, the covenant must be necessary to either (1) prevent an ex-employee from disclosing trade secrets or confidential information to the employer's competitors, or (2) to stop an employee with special, unique, or extraordinary skills from working for a competitor at a detriment to the initial employer. *See id.*

The restrictive covenant in the present case appears best categorized as a business purchase covenant since it was executed

as part of an agreement under which plaintiffs purchased a fifty
percent interest in SMD. Nevertheless, the covenant appears not
in the purchase agreement, but in the simultaneously executed
employment agreement under which Kasper agreed to serve as CEO
and president of SMD. Accordingly, while the restrictive covenant
is clearly enforceable as a business purchase covenant, I will
also address its enforceability as an employment covenant.

The restrictive covenant in this case would prevent
defendant from engaging in the provision of telecommunications
services anywhere in the world for a period of two years. Because
SMD is engaged in provision of telecommunications services only
in the Dominican Republic the geographic scope of the covenant is
unreasonable. There is no need to enjoin Kasper from the
provision of telecommunications services outside of the Dominican
Republic. Accordingly, the covenant is modified to pertain only
to telecommunications services in or out of the Dominican
Republic. The two year restriction is a reasonable time
restriction. *Jay's Custom Stringing, Inc. v. Yu,* 2001 WL 761067,
*7 (S.D.N.Y. 2001); *Churchill Communications,* 668 F.Supp. at 208,
215 (two year restriction reasonable). Kasper has been the public
face of SMD in the Dominican Republic for many years. Plaintiffs
will need a chance to establish their own identity in the
Dominican Republic before being forced to compete. Moreover,
given the hybrid nature of the covenant, plaintiffs are entitled

to a reasonably long time to enjoy the goodwill they purchased
from Kasper without being forced to compete directly with him.

Finally, in order to enforce the covenant plaintiffs must
show that it is necessary either to (1) prevent an ex-employee
from disclosing trade secrets or confidential information to the
employer's competitors, or (2) to stop an employee with special,
unique, or extraordinary skills from working for a competitor at
a detriment to the initial employer. In the present case,
plaintiffs have demonstrated the first, and accordingly, I need
not decide if they have satisfied the second. Plaintiffs have
shown that Kasper possesses confidential pricing information
about SMD customers which can and has been used to undercut SMD
pricing in order to solicit customers to SMD competitors.

In order to show likelihood of success on the merits for
their claim that Kasper's unilateral decision to downgrade the
service provided to Americall plaintiffs must show that Kasper's
actions are a breach of the parties contract. Under New York law,
"[t]o establish a prima facie case for breach of contract, a
plaintiff must plead and prove: (1) the existence of a contract;
(2) a breach of that contract; and (3) damages resulting from the
breach." *FlightSafety Intern., Inc. v. Flight Options*, LLC 2005
WL 3344827, *4 (E.D.N.Y. 2005) (quoting *National Market Share,
Inc. v.. Sterling National Bank,* 392 F.3d 520, 525 (2d Cir.
2004). Plaintiffs have established that they have a contract with

Kasper for the SMD joint venture. By making unilateral decisions in regard to the Americall contract Kasper has on the evidence adduced at the hearing breached the contract.

CONCLUSION

For the reasons set forth above, plaintiffs' request for a declaration that the first preliminary injunction is in effect and the motion for an expanded preliminary injunction are granted.

The Clerk is directed to furnish a filed copy of the within to the parties and the Magistrate Judge.


SO ORDERED.


Dated :   Brooklyn, New York
          June 29, 2006




By: /s/ Charles P. Sifton (electronically signed)
    United States District Judge